THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
February 21, 2007
Bucher

**UNITED STATES PATENT AND TRADEMARK OFFICE**

———

**Trademark Trial and Appeal Board**

———

ProQuest Information and Learning Company

v.

Jacques R. Island

———

Opposition No. 91158016
against Serial No. 78111995

———

Christina J. Hieber, Linda K. McLeod and David M. Kelly of
    Finnegan Henderson Farabow Garrett & Dunner, L.L.P. for
    ProQuest Information and Learning Company.

Yvonne Fournier-Ferrer for Jacques R. Island.

———

Before Quinn, Bucher and Cataldo, Administrative Trademark
    Judges.

Opinion by Bucher, Administrative Trademark Judge:

Jacques R. Island, a U.S. citizen, seeks registration

on the Principal Register of the mark **INQUEST** *(in standard*

*character format)* for goods recited in the application, as

amended, as follows:

> "computer software for use by institutions
> and individuals in the fields of business,
> government, law and academia to conduct
> research, namely, a database and filing
> program for gathering and storing
> information and bibliographical references,

and provides functions for scanning or downloading online information into the database and for interchanging researched data between the users' personal computers, desktop computers, servers and Internet-based data storage sites; and to automate reports, namely, to provide routines that manipulate and compile stored data into reports such as books, monographs, legal briefs, essays, articles and theses in a variety of grammatical styles" in International Class 9.[1]

ProQuest Information and Learning Company has opposed the application on the ground of likelihood of confusion, alleging that applicant's mark, when used in connection with the identified goods, so resembles opposer's previously used mark, **PROQUEST**, also registered by opposer as follows:

| **PROQUEST** | for "information retrieval systems; namely, computer hardware and software for the retrieval of textual and graphic materials, from newspapers, periodicals, dissertations, and other publications, and bibliographic citations and abstracts relating thereto" in International Class 9;[2] |
| --- | --- |

---

[1]    Application Serial No. 78111995 was filed on March 1, 2002 based upon applicant's allegation of a *bona fide* intention to use the mark in commerce.

[2]    Registration No. 1656697 issued on September 10, 1991 claiming first use anywhere and first use in commerce at least as early as July 15, 1990; renewed.

**PROQUEST** for "computer assisted research services; providing a wide range of news and research information featuring articles, publications, academic materials, and dissertations via a global computer network; online services, namely, providing computer databases containing textual and graphic materials from newspapers, periodicals, dissertations and other publications and bibliographic citations and abstracts relating thereto; consultation services in the field of computer assisted research; and support services rendered to others in the field of computer assisted research" in International Class 42;[3] and

**PROQUEST** for "computer services, namely electronic storage of textual and graphic materials from newspapers, periodicals, journals, dissertations and other publications" in International Class 39; and

"online services, namely, providing educational, instructional, teaching, and general reference materials for use by teachers and students at the high school, college, and graduate educational levels and by librarians, in [a] wide variety of fields such as science, history, business, literature, and humanities" in International Class 41.[4]

as to be likely to cause confusion, to cause mistake or to

deceive under Section 2(d) of the Lanham Act, 15 U.S.C.

---

[3] Registration No. 2468946 issued on July 17, 2001 claiming first use anywhere and first use in commerce at least as early as September 1995; Section 8 affidavit (six-year) accepted and Section 15 affidavit acknowledged.

[4] Registration No. 2751655 issued on August 19, 2003 claiming first use anywhere and first use in commerce in International Class 39 at least as early as July 1990, and claiming first use anywhere and first use in commerce in International Class 41 at least as early as December 1999.

§ 1052(d). Opposer also claimed common law rights in an unregistered design mark.



This stylized version of its **PROQUEST** mark includes opposer's "**Q** logo." Opposer alleges that both the stylized **PROQUEST** mark and the **Q** logo are used in connection with all of opposer's products and services. Opposer also alleges that the **Q** logo alone is registered for goods and services.[5]

Opposer also alleges, as a second ground for opposition, that applicant's mark so resembles opposer's mark as to cause dilution of the distinctive quality of opposer's mark, which was distinctive and became famous before applicant filed the instant application.

Applicant, in his answer, has denied all of the salient allegations in the notice of opposition.

### *The Record*

By operation of the rules, the record includes the pleadings and the file of the opposed application. In

---

[5] Inasmuch as copies of U.S. Trademark Registration Nos. 2528947 and 2726294 were not made part of the record, we have given these registrations no consideration.

support of its case, opposer made of record the testimony declaration of Scott Hirth, Vice President Finance and Chief Financial Officer for ProQuest Information and Learning Company, with Exhibits 1-18, filed on February 8, 2005 (submitted pursuant to the parties' joint stipulation for declaration testimony); and evidence under four separate Notices of Reliance, all filed on February 8, 2005:  Notice of Reliance No. 1 having certified status and title copies of opposer's valid and subsisting pleaded U.S. Trademark Registrations for the **PROQUEST** mark; Notice of Reliance No. 2 consisting of certain of applicant's responses to opposer's First Set of Interrogatories and certain of applicant's Supplementary Responses to opposer's First Set of Interrogatories; Notice of Reliance No. 3 consisting of certain of applicant's Responses to opposer's First Set of Requests for Admissions and copies of confidential documents produced by applicant in response to opposer's Document Request No. 7;[6] and Notice of Reliance

---

[6]     In its response to opposer's Request for Admission No. 1, applicant admitted that all documents it produced in response to opposer's discovery requests were authentic for purposes of admission into evidence during the testimony period in this opposition proceeding.  During its testimony period, opposer filed a notice of reliance, pursuant to 37 CFR § 2.120(j)(3)(i), on the request for admission, the exhibits thereto, and its

No. 4 consisting of a representative sample of articles from printed publications available to the general public from a search conducted in the NEXIS database.

Applicant made of record the testimony declaration of applicant, Jacques R. Island, filed on April 15, 2005, (which as noted previously, was submitted pursuant to the parties' joint stipulation that testimony could be submitted by declaration testimony); and evidence under two separate Notices of Reliance, also both filed on April 15, 2005, containing portions of opposer's Notice of Reliance No. 3 and the confidential documents attached thereto and exhibits to the testimony declaration of Scott Hirth (already submitted as part of opposer's testimony).[7] Opposer then made of record the rebuttal testimony declaration of Mr. Hirth, with Exhibits 19-20, filed on June 23, 2005.  The parties have fully briefed the case.

---

adversary's response.  See TBMP § 403.05(b) (2d ed. Rev. 2004); *see also* Fed. R. Civ. P. 36.

[7]     Applicant suggests a stipulation by the parties when it refers to the confidential documents as being "jointly submitted."  However, it was unnecessary for applicant to submit a notice of reliance on the Hirth exhibits as opposer had previously made them of record, and once of record they can be relied on by either party.

### *Preliminary matters*

Opposer has raised objections to those portions of the testimony declaration of applicant, Jacques R. Island, that discuss opposer's products and services. Opposer argues that applicant lacks competence to testify about opposer's products and services, that his testimony is self-serving argument and lacks foundation, and that it mischaracterizes the testimony of Mr. Hirth. We agree with opposer that, insofar as Mr. Island's offers his characterization of the products and services offered under the **PROQUEST** mark, the evidence suffers from foundation problems. While we do not find it necessary to exclude his entire declaration, we have accorded limited probative value to those portions of Mr. Island's brief testimony where he is offering his characterization of the products and services offered under the **PROQUEST** mark. Our understanding of opposer's goods and service is based much more heavily upon the thousands of pages of ProQuest exhibits that opposer has placed into this most extensive record.

Secondly, while conceding neither a close relationship of the goods herein nor the ultimate issue of likelihood of confusion, applicant seems to argue in the alternative, for the first time in his brief, that the Board could, *sua*

*sponte*, narrow applicant's identification of goods under Section 18 of the Trademark Act to avoid any likelihood of confusion herein.

Applicant is correct that Section 18 of the Lanham Act authorizes this Board to limit, or otherwise modify, the goods or services in a registration or application during an opposition proceeding.  15 U.S.C. § 1068; Trademark Rule 2.133(b), 37 CFR 2.133(b).  However, as argued by opposer, we will only exercise this authority where the issue of restriction has been raised in either the pleadings or by motion (or if it is clear that the issue has been tried, such that the pleadings can be deemed to be amended pursuant to FRCP 15(b)), and the possible restriction has been stated with precision such that the issue is properly framed for trial.  *See Aries Sys. Corp. v. World Book Inc.*, 23 USPQ2d 1742, 1748 (TTAB 1992); *Personnel Data Sys., Inc. v. Parameter Driven Software Inc.*, 20 USPQ2d 1863, 1865 (TTAB 1991); and *Space Base, Inc. v. Stadis Corp.*, 17 USPQ2d 1216 (TTAB 1990).  Opposer was never put on notice of a possible restriction or "limitation" either before or during the trial period, and applicant has failed to state with precision how the application should be restricted. Accordingly, to the extent that applicant's remarks may be

construed as a request for a Section 18 restriction, this request is denied.

### *The Parties*

The record shows that the involved application was filed by an individual, Jacques R. Island, who also happens to be president of Inquesta Corporation,[8] located in Coral Gables, Florida. Applicant has been developing his **INQUEST** software application to help researchers and investigators manage large amounts of information. Mr. Island describes this as "a software application dedicated to storing, sorting, organizing and producing a variety of report products [drafts, monographs, articles or books] from a multi-source database of records defined and gathered by the researchers themselves." Island declaration, ¶¶ 12 and 13. Opposer alleges in its Notice of Opposition that based on the grounds of likelihood of confusion and dilution, it would be damaged by the registration of applicant's **INQUEST** mark. This is true, according to opposer, inasmuch as ProQuest provides electronic and digital information

---

[8] Although Mr. Island testifies that the **INQUEST** software application is part of Inquesta's family of products, and will be marketed by Inquesta Corporation, the record does not make clear why Mr. Island, the individual, rather than Inquesta Corporation, is the applicant herein. Opposer, however, has not raised any issue relating to ownership of the applied-for mark.

solutions and educational resources to institutions and individuals. Opposer has used the **PROQUEST** mark since at least as early as July 1990 to identify its electronic databases and reference sources offered on CD-ROM. The **PROQUEST** brand has evolved to encompass a wide variety of research and learning products and services, including CD-ROM and online versions of **PROQUEST** database and reference products, dissertation abstracts, digital dissertations, custom publishing services, and specialized educational products and curriculum tools. These products and services are software applications that contain databases featuring information from a variety of sources as well as tools that allow users to access and search that information and to control and manage the research data they collect.

According to Mr. Hirth, ProQuest's information resources include current and past issues of 7,000 newspapers, more than 20,000 periodicals and magazines, approximately 2,000,000 dissertations, 150,000 out-of-print books, 550 research collections, more than 15,000,000 proprietary abstracts, and a wide range of other content, all totaling more than 5.5 billion pages of information.

## <u>*Standing and Priority:*</u>

Applicant has conceded that opposer has standing and priority of use, and we agree that the record establishes this.

## <u>*Analysis:  Likelihood of Confusion*</u>

Our determination under Section 2(d) is based upon an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion.  *In re E. I. du Pont de Nemours & Co*., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the relationship of the goods and/or services.  *Federated Foods, Inc. v. Fort Howard Paper Co*., 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

### *The Goods and Services*

Opposer describes itself as "a global leader in providing electronic and digital information solutions and educational resources to institutions and individuals." Opposer's brief, p. 4.  We find that the evidence of record establishes the accuracy of this claim.  Given the range of opposer's products and services, we will summarize them briefly as drawn from thousands of pages of exhibits retrieved from online sources, newspaper articles,

opposer's promotional materials and other corporate records:

1. **PROQUEST** CD-ROM Products – In 1990, opposer's disc products included periodicals, newspaper and dissertation abstracts, and other information.  Given the technology at that time, opposer offered workstations and multi-user access systems for one-stop search and retrieval of material from all types of written or published materials in every subject.  These CD-ROMs contained requisite software applications to run, access, and search databases and proprietary content including abstracts and indexes, and to download, save and print research results. These CD-ROM products continue to be available for installation on the computer systems of those who purchase them.

2. **PROQUEST** online services – In 1995, opposer launched an online version of its database and reference products.  In 1996, this changed from Windows-based access to selected databases from secure locations, to accessibility with a user-friendly, web interface over the Internet.  In addition to accessing and searching the content of large databases, Internet users are also able to use proprietary software tools that opposer has designed to

be used with and integrated into its online services. These software applications make searching easier and allow users to manage research data and to store their results. In addition to tools like keyword searching, researchers can download results in a variety of formats, and even create bibliographic citations using third-party bibliographic-management software applications such as **End Note** and **Reference Manager**.  Finally, users are able to create a summary web page ("My Research") having customizable fields that are unlimited in size, with the ability to further manipulate the downloaded materials in word-processing, citation, spreadsheet or database programs.  All of these capabilities have been available under the **PROQUEST** mark since well prior to March 2002.

3.    Proprietary **PROQUEST** databases – Since 1990, opposer has offered proprietary database products.  For example, since 2001, **PROQUEST HISTORICAL NEWSPAPERS** has offered both full text and image reproductions of leading newspapers such as *The New York Times* from their first issues through the mid-1980's, while the **HERITAGEQUEST** product offers comprehensive genealogical information.

4.    **PROQUEST** products and services for academic and educational markets – Since 1990, opposer has offered

**PROQUEST**-branded products and services specifically targeted to the higher-education market.  These include research databases (July 1990), printed and online custom course packets (July 1999), textbook supplements, study aids, opposer's **XANEDU** research engine (July 2000), and products for use in the K-12 educational market, currently available at http://www.proquestk12.com.  These resources include a variety of branded products seen throughout opposer's extensive exhibits made part of the record, including a number of products using the "-QUEST" ending: **PROQUEST**/ELIBRARY, SIRS, CULTUREGRAMS, **CHALLENGEQUEST**, **ISSUEQUEST**, **KIDQUEST** and **JUNIORQUEST**.

5.    **PROQUEST** dissertations – Since 1990, opposer has offered abstracts of doctoral dissertations and masters theses under the **PROQUEST** mark.  With more than 1.6 million entries, the **PROQUEST DIGITAL DISSERTATIONS** database represents the work of authors from more than 1,000 graduate schools and universities.  More than 60,000 new dissertations/theses are added to this database each year.

6.    **PROQUEST ARCHIVER** service – Since February 2000, opposer has offered the **PROQUEST ARCHIVER** service to publishers by hosting a publication's archive – including

past and current issues complete with full text and graphics – enabling users to purchase articles online for publications such as *The New York Times, The Los Angeles Times, USA Today, The Daily News, Newsday, Rolling Stone* and *The Saturday Evening Post.*

7. **PROQUEST** <u>Copyright Clearance and Publishing</u> <u>Services</u> – Since June 2001, opposer has offered copyright clearance services, custom publishing services and reprints of out-of-print books under its **PROQUEST** mark.

From a review of opposer's broad array of products and services, we turn again to look at applicant's identification of goods:

> "computer software for use by institutions and individuals in the fields of business, government, law and academia to conduct research, namely, a database and filing program for gathering and storing information and bibliographical references, and provides functions for scanning or downloading online information into the database and for interchanging researched data between the users' personal computers, desktop computers, servers and Internet-based data storage sites; and to automate reports, namely, to provide routines that manipulate and compile stored data into reports such as books, monographs, legal briefs, essays, articles and theses in a variety of grammatical styles."

This description of goods represents a large slice of the goods actually offered by opposer under the **PROQUEST** mark and trade name, as well as the goods covered by opposer's federal registrations for the **PROQUEST** mark.

For example, the record shows that **PROQUEST** users can take the work product drawn from their research and then manipulate it seamlessly using third-party bibliographic management software applications (e.g., using **End Note** software for creating reference databases and bibliographies, or **Reference Manager** software for use in bibliographic retrieval). Applicant has testified that his software would be competitive with **End Note** and **Reference Manager**. Island declaration, ¶12, p. 6 The end users may or may not even be aware that they are moving from opposer's proprietary products to third-party applications that are inextricably related to opposer's products. Hirth rebuttal declaration, ¶6, p. 3 Moreover, based upon our review of this extensive record, we find that the fact that opposer provides its users access to content in addition to an array of automated research tools does not mitigate the virtual overlap in these value-added tools for researchers.

Accordingly, we find that to the extent applicant's identified goods may provide any significant benefits to the researcher not available through the products and services offered in connection with the **PROQUEST** brand, they would be either complementary or otherwise closely

related.  This *du Pont* factor clearly favors the position of opposer herein.

### Channels of trade

As to channels of trade, the record demonstrates that opposer targets its goods and services directly to libraries, academic institutions, corporations and government agencies.  This characterizes the exact channels of trade through which applicant intends to market his goods.  Hence, this related *du Pont* factor also favors the position of opposer herein.

### Conditions of sale

Applicant argues that it is clear from this record that purchasers of opposer's products and services will be sophisticated purchasers.  Although neither party's goods or services are limited as to the likely classes of purchasers, we agree with applicant that given the costs of subscribing to opposer's products and services, the purchasers will be discriminating and exercise a high degree of care in contracting for these products and services.

Nonetheless, even though the purchasers of opposer's products are discriminating, careful and sophisticated (for example, employees or agents of libraries, academic

institutions, corporations or government agencies), the classes of consumers for applicant's and opposer's software applications also include the ultimate *users* of such goods and services (e.g., students, teachers, faculty, researchers, corporate and government employees, and members of the general public). *See In re Artic Electronics Co., Ltd.* 220 USPQ 836 (TTAB 1983) [although the initial purchasers (i.e., owners of arcades) are sophisticated and careful purchasers of arcade games, in determining likelihood of confusion, consideration must also be given to the ultimate users of the arcade games (i.e., the arcade's customers who are the end users of the goods)].

As in *Artic Electronics Co*, in determining likelihood of confusion, the classes of purchasers for applicant's and for opposer's software applications include not only the sophisticated initial purchasers of the expensive software applications, but also must include the ultimate users of the **PROQUEST** products and applicant's **INQUEST** product — school children, teachers, college and graduate students, professors and researchers as well as members of the general public. These users, most of whom neither participate in the decision to purchase the parties'

products nor typically pay for opposer's goods and services — cannot be considered sophisticated purchasers and also are not likely to exercise more than ordinary care when confronted with the parties' respective marks and products.

Accordingly, although the *purchasers* of the parties' products are discriminating, we cannot find that the *users* are likely to exercise more than ordinary care. Applying such reasoning tilts this *du Pont* factor in opposer's favor as well.

### Strength of opposer's mark

In his brief, applicant refers at length to the number and nature of third-party marks incorporating the term "Quest" that have been registered in connection with similar goods and services.

However, as noted by opposer, none of these registrations was correctly submitted into the record and hence cannot be considered. TBMP § 704.03(b)(1)(B) (2d ed. 2004); 37 CFR § 2.122; *In re Shapely, Inc.*, 231 USPO 72, 75 (TTAB 1986).

Furthermore, even if they had been properly included in the record, opposer correctly argues that inasmuch as there is no evidence that any of these third-party registrations are for marks that are actually in use, the

probative value of such registrations is still very limited. It is well settled that third-party registrations are not evidence of what happens in the marketplace or that the public is familiar with the use of the subject marks. *See National Aeronautics & Space Administration v. Record Chemical Co.*, 185 USPQ 563, 567 (TTAB 1975). Thus, they do not provide evidence that the marks have been used to such an extent that customers have become accustomed to seeing the marks and hence have learned to distinguish them based on minor differences between the marks. *See Smith Brothers Manufacturing Co. v. Stone Manufacturing Co.*, 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973); and *In re Hub Distributing, Inc*., 218 USPQ 284, 285-86 (TTAB 1983). "Consequently, the third-party registrations, even if they were of record, would not cause us to conclude that opposer's mark is weak or entitled to a limited scope of protection."[9]

---

[9] We also point out that the third-party marks have connotations quite different from opposer's mark (e.g., **FLEXQUEST**, **SIGMAQUEST** and **QUESTIA**) or the identified goods (network searching software, database management software, multi-media interactive training software, etc.) are not as closely related to opposer's products as are applicant's involved goods.]

### *Fame of the prior mark*

The record supports opposer's claim to being "a global leader" in selling electronic and digital information solutions and educational resources on a subscription basis to a variety of entities, including thousands of public libraries, colleges, universities, K-12 schools, government entities, corporations, and publishers.  Colleges and universities comprise more than half of opposer's subscriber base.  Representative academic customers include Harvard University, Yale University, University of California, MIT, Columbia University, Stanford University and Northwestern University.  In fact, more than ten million college and university students currently have access to opposer's **PROQUEST** online service on their campuses.  Similarly, more than 35,000 K-12 schools throughout the United States use **PROQUEST**-branded resources, with more than 70% penetration into middle schools and high schools.  Many prominent corporations, federal agencies, and thousands of public libraries throughout the United States subscribe to **PROQUEST** products and services.

By 2004, the daily usage of the **PROQUEST** online service had increased to more than 2,500,000 page views per

- *21* -

day, and opposer testified that this number continues to grow each year.  In 2004 alone, the **PROQUEST** online information service had more than 61,000 subscribers, representing tens of millions of users, more than 125,000,000 distinct sessions and more than 260,000,000 retrievals.

The record shows that opposer has sold hundreds of millions of dollars worth of products and services under the **PROQUEST** trademark since 1990:

- In 1994 alone, sales of PROQUEST CD-ROM products totaled more than $37,000,000.
- Since 1997, sales of PROQUEST branded CD-ROM products and subscriptions to the PROQUEST online service alone have exceeded $560,000,000.
- With the introduction of online access to PROQUEST products and services, sales have increased steadily.  In the six-year period from 1997 to 2003, sales of the PROQUEST online service increased from approximately $10,000,000 to more than $85,000,000, totaling more than $390,000,000 for that period.
- In 2003, net sales for all PROQUEST products and services were $270,500,000, representing an increase of 12.1% from 2002.

Since 1990, opposer has spent more than forty million dollars on marketing **PROQUEST** products and services, with annual expenditures totaling approximately four million dollars.  In 2004 alone, opposer distributed more than 50,000 full-product-line brochures and more than 200,000 copies of other promotional pieces for **PROQUEST** products

and services.  Since 1991, opposer has issued millions of bulletins and newsletters to subscribers of a wide range of **PROQUEST** products and services, all of which display the **PROQUEST** mark.

Since at least as early as 1990, opposer has placed advertisements prominently featuring the **PROQUEST** mark in print publications promoting its products and services offered under the **PROQUEST** mark (e.g., _Information Today, Computers In Libraries, Searcher, EContent, School Library Journal, Online, Access, Library Journal, American Libraries, Against the Grain, Charleston Advisor, Public Libraries, Serials Review,_ and _Teaching and Learning_.) Opposer maintains a level of high visibility at major trade shows, e.g., state and regional library, educational and genealogical shows.  Since 2000 alone, opposer has participated in more than 400 trade shows and conferences. At all of these trade shows, the **PROQUEST** mark is prominently displayed on banners, booths, and other materials visible to participants.

The record also demonstrates that **PROQUEST** products and services have received accolades and awards, as have many of opposer's advertising materials.  Similarly, the **PROQUEST** mark has received extensive media attention since

at least as early as 1990.  We find that this extensive media exposure has expanded public awareness of the **PROQUEST** mark, resulting in widespread recognition and renown of the **PROQUEST** mark, particularly among those in the academic, research, and education fields.  We are not convinced, however, that this mark is famous to members of the general public at large.

Accordingly, we would characterize this renown as niche market fame.  Within the academic, research, and education fields, the **PROQUEST** mark has achieved such a level of fame that nearly everyone in those fields recognizes the mark.  That fact certainly assists opposer in this case because applicant intends to use his mark in the same fields.  *Cf. Toro Co. v. ToroHead Inc*., 61 USPQ2d 1164, 1182 (TTAB 2001) [in the context of dilution analysis, opposer's claim of niche market fame not considered in absence of proof that the parties' trading fields overlapped]; and *Berghoff Restaurant Co. v. Washington Forge, Inc*., 225 USPQ 603, 609-610 (TTAB 1985) [opposer's proof of fame of its mark within a limited geographic area sufficient to find its mark famous for purposes of the likelihood of confusion analysis, where applicant's goods were marketed in that geographic area].

Our primary reviewing court has determined that the fame of an opposer's mark plays a "dominant role in the process of balancing the *du Pont* factors." *Recot, Inc. v. M.C. Becton*, 54 USPQ2d 1894, 1897-98 (Fed. Cir. 2000), on remand, 56 USPQ2d 1859 (TTAB 2000) [likelihood of confusion between FIDO LAY and FRITO-LAY]; and *Kenner Parker Toys v. Rose Art Industries*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992) [likelihood of confusion between FUNDOUGH and PLAY-DOH - "[F]ame of the prior mark plays a dominant role in cases featuring a famous or strong mark."] Moreover, as the fame of a mark increases, the degree of similarity between the marks necessary to support a conclusion of likely confusion declines. *Bose Corp. v. QSC Audio Prods. Inc.*, *supra* at 1309. Our primary reviewing Court, employing compelling imagery, held that "[a] strong mark … *casts a long shadow* which competitors must avoid," and "[t]here is no excuse for even approaching the well-known trademark of a competitor … and … all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous." *Kenner Parker Toys, supra.*

- 25 -

Based on this record, we find that the **PROQUEST** mark is inherently distinctive and strong.  Furthermore, opposer has demonstrated the fame of its mark measured by the length of time the mark has been in use, the volume of sales and advertising expenditures, as well as the widespread unsolicited media attention it has garnered. This mark is quite well known in the academic, educational, research and library markets — the exact same fields where applicant has indicated he intends to use his **INQUEST** mark. Accordingly, this critical factor weighs strongly in favor of finding a likelihood of confusion herein.

### *The marks*

Finally, we turn to the *du Pont* factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.  *See Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005).  We also begin this discussion of the similarity of the marks mindful of black letter trademark case law that where, as here, the marks are applied to "virtually identical goods or services, the degree of similarity necessary to support a conclusion of likely confusion declines."  *Century 21 Real Estate Corp.*

*v. Century Life of America*, 970 F.2d 874, 23 USPQ2d 1698, 1701 (Fed. Cir. 1992) [finding CENTURY LIFE OF AMERICA for insurance underwriting services confusingly similar to opposer's CENTURY 21 mark for insurance brokerage services]; *Centraz Industries Inc. v. Spartan Chemical Co*., 77 USPQ2d 1698, 1700 (TTAB 2006) [finding and ICE SHINE confusingly similar for floor-refinishing preparations]. Moreover, because we have also found that opposer's mark is famous in the academic, research, and education fields, the same fields in which applicant's mark will be used, opposer's mark is entitled to a greater degree of protection.

Contrary to applicant's position that the term "Quest" is descriptive for opposer's products, we find that the "Quest" portion of opposer's mark is most likely suggestive of its goods and services, i.e., inasmuch as these goods and services are used for research, the word "Quest" has a suggestive meaning in terms of hunting for answers. In fact, the "Quest" element, as the most distinctive portion of opposer's mark, is also the dominant portion of its mark. Accordingly, when "Quest" is combined with the syllable, "Pro-," opposer's resulting ProQuest mark appears on this record to be strong. The resulting mark appears

capable of two related connotations in that the product is a "help" in the quest for answers, and that it is good or "professional" in the help it provides. The mark's inherent strength is further reinforced with the fame that opposer has built up around its mark over the past fifteen years in the academic, educational and research fields. *See Bose Corp. v. QSC Audio Prods. Inc.*, *supra* at 1309.

We also agree with opposer that in neither mark is the first syllable the dominant part of the mark. The terms "In-" and "Pro-" are common, widely-used prefixes. Given the lessened impact of these beginning syllables on the overall impressions of the marks, we find a similarity in commercial impressions herein despite the obvious dissimilarity in the appearance, pronunciation and connotation of the respective prefixes. *See San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.*, 565 F.2d 683, 196 USPO 1 (CCPA 1977) [MONOCERAM and MICROCERAM are not sufficiently different in their total impacts to eliminate likelihood of confusion as to source]; *Rexall Drug & Chem. Co. v. Romm & Haus Co.*, 427 F.2d 782, 166 USPQ 29, 30 (CCPA 1970) [OROGLAS for synthetic resinous materials in the form of sheets, rods, or molding compounds and PROGLAS for synthetic injection plastic molding

materials confusingly similar; consumers are unlikely to distinguish between the marks based on the different prefixes, "Pro-" and "Oro-"]; and *Magnavox Co. v. Multivox Corp. of Am.*, 341 F.2d 139, 144 USPQ 501, 503 (CCPA 1965) [use of MULTIVOX on electric organs likely to cause confusion with MAGNAVOX on radios, phonographs, and television sets].

Applicant's **INQUEST** mark, in this intent-to-use application, is shown in standard character format. Hence, we must consider that applicant's mark is not limited to any special form or style as displayed on its goods. *Phillips Petroleum Co. v. C.J. Webb, Inc.*, 442 F.2d 1376, 170 USPQ 35, 36 (CCPA 1971) ["The drawing in the instant application shows the mark typed in capital letters, and … this means that [the] application [for the mark **INQUEST**] is not limited to the mark depicted in any special form" and hence we are mandated "to visualize what other forms the mark might appear in."]; *see also Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1847-48 (Fed. Cir. 2000) [LASERSWING v. LASER for golf clubs: typed drawings are not limited to any particular rendition of the mark]; and *INB National Bank v. Metrohost*, 22 USPQ2d 1585, 1588 (TTAB 1992) [CORPORATE DOLLARS PASSPORT v. PASSPORT].

It is clear from these cases that when a mark is presented in a typed or standard character format, the Board must consider all reasonable manners in which applicant could depict its mark. In particular, we must give special consideration to the ways in which applicant has actually depicted its mark. *See Phillips Petroleum*, *supra* at 36; and *INB National Bank*, *supra* at 1588. For example, applicant's mark could reasonably be depicted as **InQuest** with the letter Q in a larger size and different font, much as we had seen with opposer's usage.

" … We must not be misled by considering [applicant's] mark only in its printed or typewritten form, with all the characters being of equal height." *Phillips Petroleum*, *supra* at 36.

Accordingly, this factor too favors a finding of likelihood of confusion.

### *Conclusion on Likelihood of Confusion:*

When we weigh all the *du Pont* factors favoring opposer, including the close relationship of the respective goods/services and the fame of opposer's mark, we find that opposer has met its burden of demonstrating by a preponderance of the evidence that confusion as to source or

sponsorship from contemporaneous use of the parties' marks in connection with their respective goods and/or services is likely to occur.

### *Dilution*

Finally, we note that opposer also charges that given the demonstrated prior fame of opposer's **PROQUEST** mark, applicant's use of its **INQUEST** mark is likely to cause dilution of opposer's mark under the Federal Trademark Dilution Act of 1995.  However, given our determination that opposer has priority of use and that there is a likelihood of confusion herein, we find it unnecessary to reach a determination on the question of dilution in this proceeding.

*Decision*:  The opposition is sustained based on the ground of likelihood of confusion under Section 2(d) of the Lanham Act, and registration to applicant is hereby refused.